# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1873.

---

THE PATERSON AND PASSAIC HORSE RAILROAD COMPANY *vs.* THE MAYOR AND ALDERMEN OF THE CITY OF PATERSON and others.

1. The legislature has full power to authorize the laying of railways in the streets of a city. And a company, having such chartered authority, and having complied with all the conditions of its charter, is entitled to operate its railway without other impediment or restriction on the part of the city, than such as it may have voluntarily submitted itself to, or as may arise from reasonable municipal regulations.

2. For the purpose of consent, required by the charter of a street railroad company to be obtained from property owners along the proposed route of the railway, before it can be laid, the city corporation is to be regarded as the owner of an open public square dedicated to the public use forever, whether the fee be in the corporation or not, or in whomsoever it may be.

3. A grant of authority to lay and operate a railway in the streets of a city, without requiring the consent of owners of property along the route, is lawful. It does not conflict with that clause of the constitution requiring compensation to be first made.

4. Under a charter requiring that, before a railway should be constructed in the streets of a city, the consent of a majority of the property owners along the proposed route, and of the city, should be first obtained, the consent of a majority of the property owners is not a condition prece-

dent to the consent of the city. The consents are independent, and it is immaterial which is first obtained.

5. *Held*, that the charge of fraud upon which the city claimed the right to withdraw its consent to laying the railway, was not sustained ; and that the city, having a knowledge of all the facts, at the time of passing the ordinance giving such consent, were not in a position to allege misrepresentation.

6. *Held*, also, that the acquiescence of property owners, whose consent is necessary as a condition precedent to the exercise of the franchise granted to the company, in standing by and seeing the company construct and operate their road under a claim of right, will be regarded as evidence of consent.

The bill is filed for an injunction to restrain the defendants, who are the mayor and aldermen of the city of Paterson, the rector, wardens, and vestrymen of St. Paul's Episcopal Church of Paterson, and George Oates, from tearing up, removing, or otherwise injuriously interfering with the complainants' railroad and track in Colt street, in Paterson, or with the complainants' operation of the same, and also to restrain the mayor and aldermen from revoking, withdrawing, or modifying their consent to the construction of a railroad in Colt street, by passing any ordinance or resolution repealing the ordinance of the city, by which that consent was given, or otherwise. On the filing of the bill, an injunction was ordered, and issued according to the prayer. The defendants have all answered separately.

The complainants were incorporated by an act approved February 28th, 1868, (*Pamph. L.* 198,) and were, by that act, authorized and empowered to lay down and construct a railroad, with the necessary turnouts and switches, from a certain point in Paterson, to the village of Passaic. By a supplement approved March 17th, 1869, (*Pamph. L.* 459,) they were authorized and invested with all the rights and powers necessary and expedient to survey, lay out, and construct, on a certain route therein specified, a railway, with the necessary turnouts, in Paterson and the township of Acquackanonk, in the county of Passaic, from the then

terminus of the railroad in Paterson, to the village of Passaic; provided that the railway should not be constructed in Market or Congress streets, between Railroad avenue and Main street, nor in that part of Main street north of Congress street, without the consent, in writing, of the majority of the owners of the land (reckoning by the number of lineal feet) fronting on both sides of the said parts of Market, Congress, or Main street, respectively embraced in that proviso, being first had and obtained, and filed in the clerk's office of the county of Passaic; and further, that the railway should not be constructed in any parts of the streets in that supplement mentioned, west of the Erie railway, and north of Grand street, in the city of Paterson, without the permission of the mayor and aldermen of that city, for that purpose, being first duly granted at the meeting of the board, and the certified copy of the resolution granting such permission being first filed in the county clerk's office, and such permission being once granted, should not be afterwards revoked or modified without the consent of the railroad company. By a further supplement, approved March 17th, 1870, (*Pamph. L.* 1264,) the company were authorized and invested with all the rights and powers necessary and expedient to survey, lay out, and construct a single or double track railway, with the necessary turnouts, in the city of Paterson, through and along any street, avenue, road, and highway in that city, through which the company had not already the power and authority to lay their track; provided that the said railway should not be constructed through any of the streets or avenues through which the company had not already the power and authority to lay their track, without first obtaining the permission of the majority of the owners of property on the proposed streets or avenues, through which the said railroad was contemplated to be laid, and also of the mayor and aldermen, for that purpose. That act also provided that, in the construction, equipment, management, running, and operation of the railroad, the company should have and possess all powers, authority, and privileges granted

to or conferred upon them, and be subject to the restrictions and conditions imposed by the original act and the supplement of 1869.

It appears that, after the passage of the last mentioned act, the company being desirous of constructing a branch railway, to run from their track in Market street, through Colt street to Ellison street, in November, 1871, obtained, for that purpose, the consent, in writing, of George Oates, who, the complainants allege, then was, and still is the owner of all the property fronting on the east side of Colt street, and who, they allege, was, in himself, a majority of the owners of the land fronting on both sides of the street, reckoning by the number of lineal feet; and afterwards, and on the 3d of June, 1872, an ordinance was passed by the board of aldermen, reciting, by way of preamble, that the consent, in writing, of the majority of property owners along Washington street, from Broadway to Ellison street, and along Colt street, from Ellison street to Market street, to the construction, in said portions of said streets, of a horse railroad, by the Paterson and Passaic Horse Railroad Company, had been filed in the city clerk's office, and ordaining that the consent of the board be, and it was thereby declared to be given to the construction of the railroad in those portions of the said streets; provided that, in constructing and operating the same, the company should be governed by, and subject to the provisions of the ordinances theretofore passed, giving the consent of the board to the construction, by the company, of the horse railroad or horse railroads in other parts of the city. That ordinance, which, by its terms, took effect immediately, was approved by the mayor on the 13th of June, 1872.

It further appears that Colt street is a very short street, extending only from Ellison street to Market street, and is one hundred and eighty-seven feet in length on the east side, and one hundred and seventy-five feet five inches in length on the west side; that part of the land on the westerly side of the street embracing eighty-five feet and five inches of the front on the

street, was, at the time of the passage of the ordinance, as it still is, public property, by dedication. · The rest, ninety feet front, was, and is owned by the defendants, the church corporation.

It further appears that, in pursuance of the consent they had so obtained, the complainants constructed their railway through Colt street, and ever since then, have been operating it from Market street to within a few feet of Ellison street. They allege that the road through Colt street is of great importance to them as a branch road, inasmuch as, on account of its location, it is a convenient place from which to start their cars, and the northerly end of that branch is used as one of the termini for one of their routes. They allege, also, that their road was constructed, in all respects, in conformity to law, under the supplement of March 17th, 1870; and that they have, ever since its construction, operated it in a lawful manner, in all respects.

The complainants claim, and allege in their bill, that before proceeding to construct their road under the consent before referred to, they filed a certified copy of the ordinance and of the consent in the county clerk's office.

The defendants admit the power and authority of the company to lay their road through Colt street, and that they obtained the permission of the mayor and aldermen so to do, but claiming that George Oates was not the owner of a majority of the lineal feet on the street, deny that the complainants obtained the consent of the owners of a majority of the lineal feet of land on the street. They also deny that, under the act of 1870, the consent of George Oates would have been sufficient, even if he were the owner of a majority of the number of lineal feet. They contend that, by that act, the consent of a majority of the owners, without respect to the number of lineal feet which each might own, is required, and that, therein, that act differs from that of 1869. They allege, also, that the consent of the mayor and aldermen was given upon the representation and understanding that the consent of property owners, according to the requirements of the act

of 1870, had been duly obtained, and insist that, inasmuch as that consent had not been so obtained, the permission given by the ordinance is null and of no effect.

The mayor and aldermen state that the ordinance complained of was based on a memorial of the church corporation, setting forth that, when the city gave its consent, the permission of a majority of the owners had not been obtained. They admit that the ordinance has been passed to a third reading, and substantially admit an intention to pass it, and under it, to remove the complainants' track in Colt street; but they deny that the removal of the track, in pursuance of the revocation of the consent of the mayor and aldermen, will seriously interfere with the proper running of the cars of the complainants, and inconvenience the traveling public.

Motion is now made to dissolve the injunction on the bill and answers.

*Mr. Van Wagoner,* for the motion.

*Messrs. Tuttle* and *Griggs,* contra.

THE CHANCELLOR.

The act of 1870 gave the complainants power to lay their railway in any street, avenue, or road in the city of Paterson, through which they had not already the power and authority to lay their track, on condition that they should first obtain permission for the purpose, of a majority of the owners of property fronting on the streets or avenues, through which they proposed to lay the railway, and also of the mayor and aldermen of the city. Unlike the act of 1869, it does not require that these consents be filed in the office of the clerk of the county.

Under the power thus granted, and with the consent of the city, and, as they insist, of the majority of the owners of property on the line of Colt street, the company laid their railway in that street, that being one of the streets through which they had not the power and authority to lay their track, at the time of the passage of the act of 1870.

The city insist that their consent was unduly obtained; that it was based on their reliance on the representation made by the company, in order to induce them to give their consent, that the permission of a majority of owners, according to the requirements of the act, had been accorded, which representation, they insist, was untrue. They now propose to withdraw their consent, and the question is, whether they may do so.

The complainants derive their authority to lay and operate their railway, directly by grant from the legislature, which had full power over the subject. *Mayor, &c., of Jersey City,* v. *Jersey City & Bergen R. R. Co.,* 5 *C. E. Green* 360 ; *Dillon on Municipal Corp.,* § 555. And if they have complied with the conditions of the act, they are entitled to operate it, without other impediment or restriction on the part of the city, than those to which they may have voluntarily subjected themselves, or which may arise from reasonable municipal regulations.

The defendants insist that the act of 1870 requires the consent of a numerical majority of the owners of property on the line of the streets. The complainants, on the other hand, contend that it should be so construed as to require the consent of a majority of owners, reckoning according to lineal feet, as expressed in the act of 1869. *Pamph. L.* 460.

I leave out of view, for the present, the charge of misrepresentation.

Adopting the construction contended for by the city, the condition of the act was complied with. There were but three owners of land on the street—the city, the church, and Oates. Oates had consented. When the city consented, the permission, not only of a majority numerically, but reckoning according to lineal feet, had been given. Oates owned all the land on the east side, at least one hundred and sixty-six feet ; of that on the other side, the church owned ninety feet, and the residue, eighty-five feet and five inches, was, about thirty-eight years ago, dedicated to the public use, by the society for establishing useful manufactures, then its owners, to be an

open public square or common forever. Of this land, the city were the owners, for the purposes of the consent required by the act. It does not appear who now owns the fee, nor is that a matter of any importance. It may be, for aught that appears in the case, in the city corporation. But whether it is or not, or in whomsoever it may be, the city corporation are, for the purposes of the consent, to be regarded as its owners. By virtue of the dedication, and its charter, the city corporation have become, in some sort, the owners, having power, in trust for the community, to regulate the public use of it, and being the representatives of the public, for the purpose of maintaining suits in law or equity, for the vindication of the public right. *Trustees, &c.*, v. *Council of Hoboken*, 4 *Vroom* 19. The consent of the majority of the owners of property on the line of the street, is required by the legislature, from considerations not in anywise connected with any supposed constitutional necessity arising from any injury the railway might be supposed to inflict upon the owner of the fee. This is obvious, from the fact that the consent of a majority only is required. The dissentients, however numerous they may be, if they be in the minority, must submit to the will of the majority. If the legislature had granted the power to lay and operate the railway through the street, without the consent of the owners of the property on the street, the grant would have been lawful, and not in conflict with the constitution of the state. *Hinchman* v. *Pat. Horse R. Co.*, 2 *C. E. Green* 75. The legislature, in thus requiring the consent of the majority of the property owners, intended merely to make it a matter of choice with them, whether the railway should be laid or not. The city, in reference to the square, is an owner within the meaning of the act. It is the duty of the city authorities, and they are the proper persons, to judge as to whether the railway in the street would be prejudicial to the public property or otherwise, and that, too, in regard to property dedicated to public use, as well as to public property, the fee whereof is in the corporation.

In obtaining the consent of Oates and the city, the company complied with the condition of the act.

Nor can the effect of the action on the part of the city be avoided by the claim, that by the true construction of the act the consent of the city was to be based on, and therefore preceded by, that of a majority of the property owners. Such is not the true construction. The consents are independent of each other. The act confers the power on the company to lay the track and operate the road, on condition that the permission of the city (representing the public at large,) and of the majority of the owners of property on the street (representing the private interest to be affected,) be first obtained. If the consent of the city had first been obtained, it, of course, would not, of itself, have been sufficient; but it cannot be doubted that, if that being had, the consent of the property owners had been afterwards obtained, the condition precedent to the exercise of the power to lay the rails and operate the road would have been complied with.

The view I have thus taken renders it unnecessary for me now to consider the question raised as to the construction of the words " owners of property," in the act of 1870.

The city claims the right to withdraw its consent, not for any violation or disregard on the part of the company of the regulations or duties subject to which the consent was granted, but on the ground of fraud in the alleged representation.

I do not find any evidence of fraud. The company evidently construed the act of 1870 as requiring them to obtain the consent of the majority of owners, reckoning by lineal feet, and acted accordingly. The written consent, signed by George Oates, is dated November 21st, 1871, and is as follows : " We, the undersigned, owners, respectively, of property fronting on Colt street, between Market street and Ellison street, do hereby give to the Paterson and Passaic Horse Railroad Company the exclusive right, permission, and power, irrevocably, to lay down and construct a single or double track railway in and along Colt street, between the

above named streets." This he subscribed as being, and so represented himself to be, the owner of one hundred and eighty-seven feet on the east side of the street. If he was then the owner of so many feet as he there represented himself, and was understood by the company, to be, his consent was a compliance with the condition precedent of the act in respect to the permission of owners of lands, as the company then construed it, and as they still insist it ought properly to be construed. It is true, that he now denies that he was or is the owner of the greater part of the number of lineal feet on the street, but his denial is not so definite and explicit as to satisfy me that he may not have been, at the time of signing the consent, owner of so many feet as he represented himself to be, in signing that instrument, or that he is not so at this time. Nor does he deny that he then supposed, and represented himself to be, the owner of one hundred and eighty-seven feet. The city is in no situation to allege misrepresentation, seeing that, as appears by the recital of the ordinance giving consent, the paper signed by Oates was filed in the city clerk's office, before the introduction of the ordinance in the board of aldermen. The mayor and aldermen knew, from that instrument, that the consent of Oates alone had been obtained; they knew that it was upon his consent alone that the representation of the company, that they had obtained the consent of the majority of the property owners, was founded. They knew that the consent of the numerical majority of the property owners had not been obtained, for they knew that Oates only claimed to own property on the east side of the street, because he subscribed the consent only as the owner of property on that side; and they knew of the square or common, and the church property, on the west side. Knowing that Oates alone had consented, they were, nevertheless, willing to give their consent, and did give it. How can it be said that they acted under misrepresentation? In what did it consist? Misapprehension, there might have been, as to the construction of the act of 1870, if the construction which they insist on is the true one; but that

misapprehension, if misapprehension there was, was shared by the company also, who seem to have acted under it. That the mayor and aldermen were willing that the railway should be laid down and operated in Colt street, is evident. Would it, then, have been difficult, at the time, to have obtained their consent to it, as property owners, if that formality had been deemed necessary?

But there is another consideration of weight in this cause. The ordinance giving permission was approved in June, 1872. The company proceeded to lay and operate their railway, and ever since its completion, have continued to operate it, under their charter. The circumstances are such as to forbid the presumption of ignorance as to the facts of the case. The defendants knew the owners of the property on both sides of the street. The ordinance giving consent was publicly passed and promulgated. The company proceeded to lay their track in front of the premises of these defendants, and from the time it was laid, up to the time of presenting the memorial of the church corporation, on which the action of the city complained of in this cause is based, no action has been taken by any of the defendants. *Cur tamdiu tacuerunt?* They have stood by and seen the company act and expend their money, under a claim of right. So far as appears, in this case, they have acquiesced in the occupation of the street, by the complainants, with their railway. Certain it is, they have deferred action so long, that their delay, unexplained and unaccounted for, may well be construed into acquiescence. *Att'y-Gen.* v. *Sheffield Gas Consumers' Co.*, 3 *DeG. M. & G.* 304. The ordinance complained of is manifestly intended as means to an unlawful end, as a basis of operations for removing the track in Colt street. There is no good reason shown for the course of procedure on which the city have entered in this matter. They cannot be permitted, under such circumstances, to pursue it, especially when its design and sole purpose are to interfere with a public work.

The motion is denied.